[Civ. No. 3780.  Third Appellate District.—May 25, 1929.]

PAULINE JOHNSON, Respondent, v. WILLIAM R. COYNE, Appellant.

Julius V. Patrosso and C. C. Mishler for Appellant.

Bailie, Turner & Lake for Respondent.

FINCH, P. J. — The plaintiff, as assignee of Nelson Brothers, brought this action to recover an amount alleged to be due for labor performed and materials furnished in the painting and decorating of the interior of a dwelling-house and to foreclose a lien for the value of such labor and materials. The court found against the existence of the alleged lien, but entered judgment against the defendants Coyne and Weisman for the amount demanded in the complaint. The defendant Coyne has appealed from the judgment.

The appellant contends that, at most, the evidence merely shows that he made an oral promise "to answer for the debt or default" of Weisman, and that such promise is invalid because not in writing. It is conceded, of course, that the evidence must be viewed in the light most favorable to the respondent, and all contradictory evidence is omitted.

Prior to May 8, 1923, Coyne and his wife were the owners of the property involved in this suit. On that day they conveyed it to S. R. and Elizabeth S. Ow, who in turn gave Coyne and his wife a mortgage on the property to secure a promissory note for $15,000, and on July 5, 1923, Ow and his wife executed a trust deed to secure another promissory note in favor of the Coynes for $7,500, payable November 8, 1923. Thereafter and prior to the employment of the Nelsons, Ow and his wife conveyed the property to Weisman, subject to the mortgage and the trust deed. After the completion of the work and before the commencement of this suit, the property was sold under the trust deed, Coyne and his wife becoming the purchasers, their bid being the only one made at the sale. The following evidence appears in the record, the quotations, except as otherwise stated, being taken from the testimony of R. A. Nelson, one of the Nelson Brothers: "Mr. Coyne told us that he intended selling the house to a man named Mr. Weisman, and the condition of the house at the present time it couldn't be resold; so he was trying to arrange to have us redecorate it, and arrange a contract with Mr. Weisman for the redecorating of

it, but yet Mr. Weisman didn't have any money, he was quite sure, and he wasn't quite sure Mr. Weisman would be able to pay for the contract; and if he didn't pay us, not to worry, that he, Mr. Coyne, would pay us. . . . He told us not to worry; that he would see the money got to us all right." On the following day the Nelsons met with Coyne and Weisman at the house in question. They were then informed for the first time that Weisman had purchased the property. "Mr. Coyne called me to one side and asked me about what my figure was. . . . I told him the price was $1,143, and he said: 'Well, I don't hardly think you will be able to get it out of Mr. Weisman, but if not I will pay you. . . . Figure about $200 on that price for me, in case he does pay you,' . . . but if Mr. Coyne was to pay it, he would pay $1,143." The Nelsons and Weisman thereupon agreed upon a price of $1,343 for the work, but no written contract was executed. "We were to receive $500 in 30 days, $643 in 60 days and $200 in 90 days. . . . After we had started to work, Mr. Coyne advised us to take our time on it, because he told us he didn't think Mr. Weisman was financially able to pay it, and to give him plenty of time to get it. And 30 days, when our first payment of $500 came due, we hunted up Mr. Weisman, and Mr. Weisman informed us that he was unable to pay us at that time; and we went to Mr. Coyne and told him that, and Mr. Coyne told us the best thing for us to do would be to knock off the job; and he said he knew Mr. Weisman couldn't get anybody to duplicate our work or finish the job; and Mr. Weisman also knew that; and if we knocked off the job we might bring Mr. Weisman to terms and persuade him to get the money." The Nelsons then quit work for "two weeks or more" and then returned at Coyne's suggestion. "He came to our house one evening and told us . . . he thought he had it arranged for Mr. Weisman to sell the house to a Mr. Eiseman; that Mr. Coyne would take care of the first initial payment due us, and we could enter into a contract for the balance of the work to be done, with Mr. Eiseman." About forty per cent of the work had been done at that time. Before commencing work under the original contract, "Mr. Coyne told us . . . not to do anything on the house without consulting him first, in regards to colors and one thing and another." Coyne "told us to go ahead and draw up a con-

tract with Mr. Eiseman to finish the house, and try to get as much from him as possible, but for us not to worry, that the job really went on on the old agreement.'' The Nelsons then entered into a written agreement with Eiseman to complete the work for $750, and ''Mr. Coyne told us before we did any finish decorating in the house . . . to consult him first, because he didn't want the house ruined again like it had been in the first place. . . . Q. Did you have any further conversation after that time with Mr. Coyne, respecting the work? A. He and Mr. Weisman came on the job one day and seemed very excited, and told us that the way things were shaping up he thought Mr. Eiseman would not be able to hold the house. . . . He told us that if Mr. Weisman got the house back from Mr. Eiseman, that we would start right in again, and Mr. Coyne and Mr. Weisman would pay us right up on the old contract. . . . Mr. Coyne . . . came to us one day and told us that we were not to let Mr. Eiseman in the house.'' The Nelsons then quit work on the house. The work was ''pretty well advanced'' at that time. About ''a week or a week and a half'' later they resumed work at Coyne's request. ''He told us to come back over and resume work on the job; that he had the house back, and we should come back and finish the job and he and Mr. Weisman would pay us.'' After the work was completed ''Mr. Coyne said the work was entirely satisfactory, and he was sure it would be sold in a short time to somebody with some money, and whoever he sold it to he was going to sell it with the agreement that they were going to help him pay us for our decorating.''

During the progress of the work Coyne visited the job ''nearly every day'' and, according to Nelson's testimony, he gave instructions that no changes be made in the decorations as planned without his approval and, from time to time, he directed the temporary discontinuance and the resumption of work. At the time the Nelsons agreed to do the work, Coyne told them that ''Weisman didn't have any money . . . and he wasn't quite sure Mr. Weisman would be able to pay for the contract.'' It is a reasonable inference from the evidence that Coyne then believed that Weisman was not financially able to pay for the property and that Coyne was anxious to have the house redecorated because in its then condition ''it couldn't be resold.'' He

knew that the promissory note for $7,500, secured by the trust deed, was long overdue and that, since Weisman had no money, it would be necessary to effect a sale of the property. He knew that the redecorating would add greatly to the market value of the house and that if he became the purchaser at a sale of the property under the trust deed he would receive the full value of the work to be done. The Nelsons were employed on March 18, 1924. Nelson testified that the work was completed about July 22, 1924. The trustee's deed to the Coynes recites that on July 12, 1924, the Coynes recorded notice of default in payment of the promissory note and their election to cause the property to be sold. From these facts it appears that Coyne was taking steps to cause the sale of the property before the work was finished. ▮ It. cannot be held, as a matter of law, that the evidence is insufficient to warrant the finding of the trial court to the effect that Coyne's promise was an original one rather than a mere promise to answer for the default of Weisman. Under a similar state of facts, in *Davis* v. *Patrick*, 141 U. S. 479 [35 L. Ed. 826, 12 Sup. Ct. Rep. 58, see, also, Rose's U. S. Notes], the court said:

"Were it not for the Statute of Frauds there would be no question, for obviously there were both promise and consideration. Defendant relies upon that provision of the Statute of Frauds which forbids the maintenance of an action 'to charge the defendant upon any special promise to answer for the debt, default, or miscarriage of another person, unless the agreement upon which such action shall be brought, or some memorandum, or note thereof, shall be in writing,' etc. The purpose of this provision was not to effectuate, but to prevent, wrong. It does not apply to promises in respect to debts created at the instance and for the benefit of the promisor, but only to those by which the debt of one party is sought to be charged upon and collected from another. . . . Whenever the alleged promisor is an absolute stranger to the transaction, and without interest in it, courts strictly uphold the obligations of this statute. But cases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a personal, immediate, and pecuniary interest in the transaction and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason

which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise. . . . There is a marked difference between a promise which, without any interest in the subject matter of the promise, in the promisor, is purely collateral to the obligation of a third party, and that which, though operating upon the debt of a third party, is also and mainly for the benefit of the promisor. The case before us is in the latter category.''

When the work was nearing completion the defendant Coyne told the Nelsons that ''if Mr. Weisman got the house back from Mr. Eiseman, that we would start right in again, and Mr. Coyne and Mr. Weisman would pay us right up on the old contract.'' At a later time Coyne requested the Nelsons to resume work, saying that ''he had the house back . . . and he and Mr. Weisman would pay us.'' In *Ogden* v. *United Bank & Trust Co.*, 206 Cal. 571 [275 Pac. 430], the defendant bank was held bound by a promise made under similar circumstances, after the work involved in that action had been partially performed.

■ Appellant contends that ''the judgment is excessive, as it appears without conflict from the testimony on behalf of the respondent that the appellant was to be liable only for the sum of $500 in the event Nelson Brothers made a contract with J. J. Eiseman.'' The evidence referred to in the last paragraph shows that at and subsequent to the time that Eiseman gave up the property, Coyne promised to pay the Nelsons under the terms of the original agreement for the work performed and to be performed. Under the Ogden case, he is bound by such promises.

■ Appellant complains that ''the trial court, over the objections of the appellant, permitted the introduction of evidence to the effect that the appellant had guaranteed the payment of work performed by others upon the premises in question.'' The part of the record to which appellant calls attention, however, does not support his statement. He was asked on cross-examination if he had ''guaranteed the payment of some of the bills on this job by a written guarantee.'' Without objection he replied that he had not. Later his objections to similar questions were overruled and in each instance his answer was either that he had not guaranteed payment or that he did not remember. Finally he gave an answer which was not responsive to the question asked

him, to the effect that he had paid some Japanese for washing windows and some "working men." Bearing in mind that the case was tried before the court without a jury, the appellant could not have been prejudiced by the cross-examination.

The judgment is affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.