[Civ. No. 10719. Third Dist. Mar. 17, 1964.]

MICHAEL DISTRIBUTING COMPANY, INC., Plaintiff and Respondent, v. HERBERT D. TOBIN, Defendant and Appellant.

Mosk & Rudman and Edward Mosk for Defendant and Appellant.

Lewis & Lewis and George B. Hendry for Plaintiff and Respondent.

SPARKS, J. pro tem.*—The instant litigation arose out of the attempt by plaintiff, Michael Distributing Company, Inc., doing business as Economy Lumber Company, to collect for lumber supplied in the building of a number of units in a housing project known as "Southgate Units No. 1 and 2." Judgment was entered in its favor for $11,704.20 and against defendant, Herbert D. Tobin, appellant herein.

Error is predicated upon: (1) the alleged insufficiency of the evidence to show an actionable promise by appellant Tobin as a personal obligation to pay for the lumber; (2) the finding by the trial court that defendant Tobin was responsible on the basis of a "new" promise, allegedly neither pleaded, proved nor argued; and (3) the failure by the court to apply the statute of frauds as a bar to recovery upon an oral promise to answer for the debt of another.

The findings of the trial court challenged as being insufficient are:

"[T]hat during or about the month of April, 1960, defendant Herbert D. Tobin orally promised that if plaintiff would continue to deliver additional lumber and building materials to permit the continued construction of said houses, he personally would supply funds to defendant corporations by which said corporations would be enabled to pay plaintiff in full for all such merchandise; that thereafter and up to July 27, 1960, plaintiff, relying upon said oral promise of defendant Herbert D. Tobin and relying on the personal credit of said Tobin, continued to deliver lumber and building materials which defendant corporations used in the construction of said houses; ...

---

*Assigned by Chairman of Judicial Council.

"[T]hat said oral promise made by defendant Herbert D. Tobin was made by him upon a consideration consisting of plaintiff's future and continued delivery of lumber and building supplies, which consideration was beneficial to said Tobin personally as major stockholder of said two corporations."

The background of events leading to the institution of the action revealed that appellant Tobin was a member of a family of builders, the activities of which for two or three generations had been conducted generally in Southern California under a variety of corporate names, such as: White House & Garden, Inc.; Ramona House & Garden, Inc.; Harlan House & Garden, Inc.; Mountain House & Garden, Inc., et cetera. In the Sacramento area the corporate names used for the Southgate projects were Harbour House & Garden, Inc. and Lewis House & Garden, Inc. Herbert D. Tobin was the president and owner of 51 per cent of the capital stock of both of these corporations, the remaining 49 per cent of each being owned by a codefendant, W. J. Bortner. The Tobin Companies, a corporation, also named as a defendant, was primarily a management company and billed the other companies for their pro rata of salaries paid.[1]

In December 1959 Harbour House entered into a written agreement as "owner and contractor" with Cleo W. Smith and Donald R. Smith, subcontractors. By the terms of this contract the Smiths agreed to furnish the lumber and do carpentry work in the construction of 54 units in "Southgate Unit # 1." The subcontractors attempted to obtain the lumber from Economy but were unable on the basis of their credit rating to obtain a commitment for a project of that magnitude. Because of this disinclination by Economy to furnish the building supplies, a meeting was arranged with the representatives of Harbour House and Economy. As a result of this conference, Economy was induced to furnish the lumber to the Smiths upon the agreement that Harbour House on the tenth of each succeeding month would pay for the lumber directly rather than through the subcontractor.[2]

---

[1]For convenience the names of the several corporations involved will hereinafter be abbreviated as follows: Plaintiff-respondent, Michael Distributing Company, doing business as Economy Lumber Company, as "Economy"; defendant Harbour House & Garden, Inc. as "Harbour House"; defendant Lewis House & Garden, Inc. as "Lewis House"; and defendant The Tobin Companies as "Tobin Companies."

[2]There was a divergence in the evidence as to the persons present at this preliminary meeting held sometime in late December 1959, or early

Accordingly, Economy began to supply lumber to the Smiths, and thereafter received monthly payments from Harbour House.

In March 1960 it was proposed to expand the project by adding an additional 20 houses to the Southgate unit. Another contract was entered into whereby the Smiths again agreed to furnish the lumber and carpentry work. In the second contract Lewis House was named as the owner. About this time it became noticeable that Harbour House was encountering financial difficulties,[3] attributed by its president, appellant Tobin, to damage caused by storms which had necessitated the replacement of certain road work and also to a retarded market in the selling of houses. As a result the payments to Economy had slowed to a point where the latter refused to furnish further lumber to the Smiths. With the project thus brought to a standstill, in April 1960 a meeting was arranged to find, if possible, some escape from the economic impasse. Appellant Tobin flew to Sacramento in the private aircraft of Tobin Companies and with the pilot, Patrick Brown, attended the conference.

■ On the appellate level it is neither our province nor prerogative to retry issues of fact. Our function begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the findings. (*Primm* v. *Primm*, 46 Cal.2d 690 [299 P.2d 231]; *Grainger* v. *Antoyan*, 48 Cal.2d 805, 807 [313 P.2d 848]; *Crawford* v. *Southern Pacific Co.*, 3 Cal.2d 427, 429 [45 P.2d 183]; *Owens* v. *White Memorial Hospital*, 138 Cal.App.2d 634, 638 [292 P.2d 288].) ■ If there is a choice of inferences reasonably to be drawn from the evidence, the ones adopted by the trier of fact *must* prevail. (*Callahan* v. *Gray*, 44 Cal.2d 107 [279 P.2d 963]; *Benam* v. *Benam*, 178 Cal.App.2d 837 [3 Cal.Rptr. 410].) ■ And it is elementary that the testimony of only one witness found worthy of belief is sufficient for the proof of any fact and justifies a finding in accordance with such testimony, notwithstanding a number of other witnesses have testified to

January 1960, as well as to the extent of the assurances given to Economy, on the basis of which it reversed its previous decision not to supply the lumber. The actionable promises fixing liability upon defendant Herbert D. Tobin were found by the court to have been made at a subsequent meeting in April 1960.

[3]The financial difficulties of Harbour House, Lewis House and Tobin Companies continued to worsen until at the time of the trial all three had become insolvent.

the contrary. (Code Civ. Proc., § 1844; *Francis* v. *City & County of San Francisco,* 44 Cal.2d 335 [282 P.2d 496]; *Joseph* v. *Drew,* 36 Cal.2d 575 [225 P.2d 504]; *Stafford* v. *Alexander,* 182 Cal.App.2d 301 [6 Cal.Rptr. 219].)

 Our review in the light of these rules convinces us that there was evidence in the record, if believed, of sufficient substantiality to support the finding that defendant Tobin at the April meeting personally promised and obligated himself to pay for the lumber furnished by Economy. Testimony appearing in the record in support of this finding is quoted in the footnote.[4]

 Credibility of the several witnesses, whether or not they had been impeached by contradictory evidence, or by their own contradictory statements, if there were found to be any, and the proper weight to be given such testimony all were factual matters to be resolved at the trial level. (*Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]; *Tupman* v. *Haberkern,* 208 Cal. 256 [280 P. 970]; *Menning* v. *Sourisseau,* 128 Cal.App. 635, 638 [18 P.2d 77]; *Sminia* v. *Department of Water & Power,* 119 Cal.App. 428 [6 P.2d 561]; *Benam* v. *Benam, supra,* at p. 841; *Curtis* v. *Mendenhall,* 208 Cal.App. 2d 834, 839 [25 Cal.Rptr. 627].) It is true that there were discrepanices in the testimony of plaintiff's witnesses as to the dates of the two conferences, the places where they were held, and the persons who were present. But similar

---

[4]John D. Uhart, credit manager of Economy, testified: ''I told Mr. Tobin we weren't going to ship any more material, that we were—he was behind in our agreed pay schedule, and that I was concerned.

''He told me at the time that I had nothing to worry about. He said, 'Builders always get into these little difficulties, but we will work our way out somehow. In fact, I have a deposit on a hospital that is nearing completion.' In fact, the notice of completion was supposed to have been filed that week or the week after. When that was filed, it would consummate a deal in cash. I asked him if we could expect payment from these funds, and he said, 'Definitely. I will have plenty of money then.' ''

Donald R. Smith, one of the subcontractors, testified relative to the same conversation: ''Q. What did Mr. Uhart say? A. He said he wouldn't ship any more material until he was paid, or he could make some definite arrangements for being paid. Q. What did Mr. Tobin say in reply to this? A. Mr. Tobin said he would be paid and then he told us—I was beginning to get concerned about my money, then—he told us—in fact, they were behind in paying me at that time, $4,700.00, if I remember right. He said he had sold a hospital and had quite a large deposit on it, but that the money was tied up and he couldn't use it until it cleared escrow or notice of completion, or something like that, but he definitely had the money to take care of any shortage. Q. Any what? A. Any shortage. Q. Did he say he would pay? A. Yes.''

vagaries also appeared in the testimony of witnesses produced by the defendant. Such inconsistencies could have been regarded by the trial judge as of small consequence in comparison with the *vital question, whether or not defendant Tobin had promised and agreed personally to be responsible for further deliveries of lumber.*

In commenting on the evidence at the conclusion of the trial, the judge said: "I believe Mr. Smith and I believe Mr. Uhart that Mr. Tobin gave them personal assurance at that time that he personally would make good for these accounts. I don't know where else these gentlemen could have had the information regarding the deposit on the hospital except from the lips of Mr. Tobin himself.

"I believe there was a guarantee by Mr. Tobin, personally, that he would make good on these accounts if they continued to supply lumber to these projects, and I don't believe he confined his guarantee to future deliveries. I believe he was talking—they weren't segregating these accounts into what was owed then or in the future—in effect, he said, 'Keep the lumber coming, and I will make good.' "

Such opinions of the trial court are helpful in disclosing the manner in which it weighed the evidence and appraised the credibility of witnesses. For that purpose they may be considered on appeal. (*Silvers* v. *Wesson,* 122 Cal. App.2d 902, 906 [266 P.2d 169]; *Stockton Theatres, Inc.* v. *Palermo,* 124 Cal.App.2d 353, 357 [268 P.2d 799].)

Defendant's contention that even if there were evidence that he had made a promise to pay for the lumber, it was insufficient to show that he was at the time acting in a personal rather than in a corporate capacity. Again, this was a question of fact to be resolved by the trial court. Its conclusion to the contrary was substantially supported.

In his next assignment of error appellant asserts that he was held responsible for a promise which had neither been pleaded, proved nor argued. In reviewing this contention, we have examined the amended complaint and note that the defendants named included appellant in his individual capacity as well as the corporations in which he was principal stockholder.

Paragraph VI of said amended complaint contains the following allegations:

"[*T*]*hat thereafter,* the said defendant Herbert D. Tobin did likewise promise and agree, on *behalf of himself* and the said defendants, that the Tobin Enterprises would pay all

and singular the said moneys and did ratify and confirm each and all of the matters and things promised by said W. J. Bortner to the said plaintiff; that thereupon and upon the assurance of the said W. J. Bortner on behalf of the Tobin Enterprises, and Herbert D. Tobin on behalf of the defendants and on *behalf of himself*, said plaintiff did supply and deliver goods, wares, and merchandise to said defendants in the total reasonable value of $69,048.39, . . ." (Italics added.)

In plaintiff's opening statement to the court, the following appears: "Also, we plan to show subsequent to the beginning of the delivery and the oral contract, that the defendants became late in their payments, and payments were overdue. At that time, one of the defendants, *Mr. Tobin, again promised to, orally promised to, pay the debt personally* if they would start delivering goods again to the tract in question." (Italics added.)

At the conclusion of the evidence, the trial court in its comments, alluded to, *supra,* made it unmistakably clear that if defendant Tobin were found liable it would be on the basis of statements made by him at the April meeting. The proper interpretation to be given to these statements then was argued at some length by both counsel.

The record shows that evidence of the April meeting went into the record without objection. Nor was there urged at the trial any claim of surprise or lack of opportunity for preparation. On the contrary, defendant's case reflected anticipation of the evidence introduced on the allegedly new issue. A witness, Patrick Brown, who resided in Riverside, California, was called by defendant. His testimony related exclusively to the April meeting and obviously was introduced in an attempt to refute evidence that appellant had promised *at that meeting* to pay for the merchandise in question. A letter bearing date a week before the trial, and which was used in an attempt to impeach the testimony of Donald R. Smith concerning the April meeting, falls in the same category. We therefore cannot conclude that the theory adopted by the court injected any element of surprise to appellant's prejudice.

Even where evidence outside the pleadings has been introduced without objection and the case tried on its merits, the issue may not be raised first on appeal. (*Lowe* v. *Ruhlman,* 67 Cal.App.2d 828 [155 P.2d 671]; *Fontana* v. *Upp,* 128 Cal. App.2d 205 [275 P.2d 164]; *Kantlehner* v. *Bisceglia,* 102

Cal.App.2d 1 [226 P.2d 636]; *Gray* v. *Janss Investment Co.,*
186 Cal. 634 [200 P. 401].) Absent a showing that
appellant has actually been misled, a judgment will usually
be affirmed if the findings supported by the evidence are
sufficient to warrant the relief granted on any legal theory.
(*Sears* v. *Rule,* 27 Cal.2d 131, 140-141 [163 P.2d 443]; *Hay*
v. *Allen,* 112 Cal.App.2d 676 [247 P.2d 94].)

 The finding that defendant Tobin had promised and
agreed to make payment for the merchandise by paying the
amount due to a corporation of which defendant was presi-
dent rather than to plaintiff directly did not, in our opinion,
add any new quality to the promise of performance that
could have been prejudicial. Since appellant at all times had
denied that he had made any promise to pay the bill, or to
obligate himself in any way for its responsibility, it would
seem naive, indeed, to infer that he might nevertheless have
paid the contested amount out of his private funds, and yet
failed to make that fact known at the trial. Nor does it ap-
pear that he was placed to any disadvantage by the manner
in which the findings incorporating the point and quoted,
*supra,* were prepared and signed. He certainly was not pre-
cluded from raising on a motion for new trial the same objec-
tions to the findings as urged here. (Code Civ. Proc., § 662.)

 The final point assigned as error was the failure of
the trial court to apply the statute of frauds. Since the prom-
ise made by defendant Tobin was to answer for the debt of
another, and was not in writing, it is urged by appellant that
plaintiff's claim was barred by the provisions of section 1624
of the Civil Code.[5]

 A recognized exception to the statute occurs, how-
ever, when the oral promise is made for a consideration bene-
ficial to the promisor, so that it appears that he gave the
promise merely for his own pecuniary or business advantage.
In such case it is deemed an original obligation of the prom-
isor and need not be in writing. (Civ. Code, § 2794, subd.
(4).)[6] Thus, the test of exclusion from the statute of

---

[5]The portions of the Civil Code, section 1624, relied upon by appellant
read:

"The following contracts are invalid, unless the same, or some note
or memorandum thereof, is in writing and subscribed by the party to be
charged or by his agent:

"2. A special promise to answer for the debt, default, or miscarriage
of another, except in the cases provided for in section 2794."

[6]Civil Code, section 2794, reads: "A promise to answer for the
obligation of another, in any of the following cases, is deemed an

the new promise depends upon the "main purpose" or "leading object" of the promisor.[7]

The provisions of subdivision (4) of section 2794 of the Civil Code have been held by California authority applicable to a variety of factual situations. In 1929 this court was called upon to consider the problem whether a verbal promise was an original one or rather a mere promise to answer for the default of another. (*Johnson* v. *Coyne*, 99 Cal.App. 153 [277 P. 1093].) We first paraphrase, and then quote, some of the salient language of that case.

 The purpose of the statute of frauds was to prevent, not effectuate, wrong. Were it not for the statute, verbal contracts of the type in question would be upheld, since they have both promise and consideration. However, where the alleged promisor is an absolute stranger to the transaction, and without interest in it, the obligation of the statute will be strictly upheld.

"... But cases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a *personal, immediate, and pecuniary interest* in the transaction and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise. ..." (*Johnson* v. *Coyne, supra,* at pp. 157-158.) (Italics added.)

In evaluating the consideration of such contract, the use of the "main purpose" or "leading object" rule specifically has been approved by the Supreme Court. In the case of *Schumm* v. *Berg,* 37 Cal.2d 174, 187 [231 P.2d 39, 21 A.L.R. 2d 1051], it adopted with approval the following language from the case of *Greenfield* v. *Sudden Lumber Co.,* 18 Cal. App.2d 709 [64 P.2d 1007] : " 'Whenever a promise to answer an antecedent obligation of another is made upon a fresh consideration beneficial to the promisor, no matter from what source it may move, the promise is an original one and valid though oral; or, as was said in an early case, whenever the

original obligation of the promisor, and need not be in writing: . . .

"(4) Where the promise is upon a consideration beneficial to the promisor, whether moving from either party to the antecedent obligation, or from another person."

[7] For discussion of the "main purpose" or "leading object" rule see notes by Professor Lawrence P. Simpson in 36 California Law Review 405; and 1 Witkin, Summary of California Law, Contracts, section 100, page 108.

leading and main object of the promisor is not to become surety or guarantor of another, but to *subserve some purpose or interest of his own,* his promise is not within the statute, although the effect of the promise may be to pay the debt or discharge the obligation of another.' " (Emphasis added.) (To like effect: *Raboff* v. *Albertson,* 122 Cal.App.2d 555 [265 P.2d 139]; *Regus* v. *Schartkoff,* 156 Cal.App.2d 382 [319 P.2d 721]; *Kale* v. *Bankamerica Agr. Credit Corp.,* 2 Cal. App.2d 113 [27 P.2d 494]; *Ogden* v. *United Bank etc. Co.,* 206 Cal. 571 [275 P. 430]; *Fairchild* v. *Cartwright,* 39 Cal. App. 118 [178 P. 333].) The early case of *Harris* v. *Frank,* 81 Cal. 280 [22 P. 856], cited by appellant is not helpful for the reason that the promise relied upon was purely collateral to the main contract and of no benefit or consideration to the promisor. Judgment for the defendant was affirmed, but had the promise been shown to have been made, defendant clearly would have been a guarantor.

In the case before us, the trial court found that appellant was benefited personally by the contract, and that his promise to pay for the building materials was supported by consideration consisting of plaintiff's future and continued delivery of lumber and building supplies.[8]

The deduction of the trial court that appellant was motivated in making the promise by considerations of benefit to himself was justified. (Appellant testified that he expected to profit personally from the Sacramento job if it had worked out.) As the owner of 51 percent of the capital stock of both corporations, he had a very direct and personal interest in their affairs. From the evidence it reasonably could be concluded that the pecuniary benefit which he might hope to reap from the success of the housing project was the main object of his promise. The finding that defendant agreed to pay the amount due through the corporations rather than to plaintiff directly does not necessarily require an inference of suretyship. We find no error in the trial court's conclusion

---

[8]The illustration of section 184 of Restatement of Contracts appears exactly in point: "1. D contracts with S to build a house for S. C contracts with D to furnish materials for the purpose. D, in violation of his contract with C fails to pay C for some of the materials furnished. C justifiably refuses to furnish further materials. S orally promises C, that if C will continue to furnish D with materials that C previously agreed to furnish, S will pay the price not only for the materials already furnished but also for the remaining materials if D fails to do so. S's promise is enforceable."

that the statute of frauds did not operate as a bar in the instant case.

Appellant has also appealed from the order denying his motion for a new trial. This is a nonappealable order and the purported appeal therefrom is dismissed.

The judgment is affirmed.

Pierce, P. J., and Schottky, J., concurred.