**BARTHOLOMAE CORPORATION, a corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 14795.

United States District Court
S. D. California, Central Division.
Nov. 2, 1955.

Irl D. Brett, Los Angeles, Cal., and Mize, Kroese, Larsh & Mize, Santa Ana, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Max F. Deutz, Asst. U. S. Atty., Andrew J. Weisz, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

BYRNE, District Judge.

Plaintiff, a California corporation, brings this action for damages to certain buildings located on land owned by the plaintiff and known as Fish Creek Ranch in Nevada. On October 22, 1951, through November 5, 1951, the United States acting through its executive agency, the Atomic Energy Commission, performed experiments with atomic energy and nuclear detonations. These detonations took place about 150 miles southeast of the plaintiff's ranch at a site known as Frenchman's Flat, and allegedly caused the damage to the plaintiff's buildings.

The complaint is in four counts; the first two counts sounding in negligence, the third in liability without fault, and the fourth in eminent domain. The jurisdiction of this court is asserted to derive from 28 U.S.C.A. §§ 1346(b) and 1346(a) (2).

The evidence is not sufficient to support a finding of negligence [1] nor a finding that the detonations were the proximate cause of the damage complained of; however, it is not necessary to rest decision on that ground. When Congress adopted the Tort Claims Act, 28 U.S.C.A. § 1346(b), waiving the Government's immunity from actions for injuries to person or property occasioned by the tortious conduct of its agents, it provided

---

1. In count two the plaintiff relies upon the doctrine of res ipsa loquitur. This doctrine does not apply unless (1) defendant had exclusive control of the thing causing the injury and (2) the accident is of such a nature that it ordinarily would not occur in the absence of negligence by the defendant. Escola v. Coca Cola Bottling Co. of Fresno, 24 Cal.2d 453, 150 P.2d 436. The injury complained of in the instant case is the cracked plaster in the buildings located on the plaintiff's ranch. In the first place the evidence does not establish what "thing" caused the injury and in the second place the "accident" is of such a nature that it ordinarily occurs in the absence of negligence, i. e. from temperature changes and earth temblors. The doctrine of res ipsa loquitur has no application in situations such as this.

that the waiver would not apply to "(a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C.A. § 2680. It is clear that if plaintiff's claims are based on the performance by defendant of a discretionary function, counts one, two and three must fall.

Prior to the detonations complained of, the Atomic Energy Commission had determined that a continental testing area was necessary to conduct experiments with atomic energy. For that purpose the President of the United States established the Nevada Proving Grounds for the tests. The experiments conducted between October 22, 1951, and November 5, 1951, consisted, in part, of detonating weapons containing fissionable and radioactive materials. The detonations caused blast waves and air shock waves which could reach into and bounce or rebound from atmospheric layer elevations that surround the earth. These shock waves are capable of erratic behavior and at the time of the acts complained of they could not be completely controlled.

Each test series, including the one involved here, emanates from the Los Alamos Laboratory. Initially, a description of the test series is included in the annual Laboratory Program, for the approval of the Atomic Energy Commission. Thereafter, a more detailed program is prepared in the Los Alamos Laboratory. It is then approved by the Santa Fe Operations Office, by the Division of Military Applications of the Atomic Energy Commission, and by the Atomic Energy Commission. Through the National Security Counsel, the Atomic Energy Commission receives the approval of the President to detonate the devices and expend the nuclear material. The test manager is then appointed and given authority to conduct the series. Thereafter, the test manager directs the test organization with regard to the schedule of operations to be followed, the sequence and dates of detonations and the procedure involved. The decision to detonate at a particular time is made by the test manager, upon the recommendation of a board of experts each one foremost in his particular field, so that detonation can be accomplished with maximum safety.

As a part of this program to insure maximum safety it is necessary to determine atmospheric conditions so that the radius of the blast may be ascertained. As yet it is impossible to determine conditions at high altitudes with absolute accuracy. Dr. Cox, a member of the team conducting the tests, devised a method of detonating high explosives approximately one hour prior to the blast and scaling up the reading in order to predict the expected blast pressure at the higher altitudes. This was accomplished by taking readings from microbarographs as close to the time of the blast as possible. Eight microbarographs, the available supply in the country, were secured and placed at strategic points according to the judgment of Dr. Cox. The readings were given to the panel of experts who weighed the information and advised the test manager as to blast safety. The test manager then made the decision whether to detonate or not.

The basis of the plaintiff's claims in the first two counts is the asserted negligence of Dr. Cox in placing all of the available microbarographs in the direction of the more populated areas of Las Vegas, Henderson and Boulder City, and not placing one in a "northerly direction" towards the plaintiff's ranch. The plaintiff contends that the discretion exercised by Dr. Cox and his associates at the test site was not of the discretionary character stated to be not actionable by Section 2680.

In Dalehite v. United States, 1953, 346 U.S. 15, at page 35, 73 S.Ct. 956, at page 968, 97 L.Ed. 1427, the Supreme Court discussing the scope of the discretionary function protected by Section 2680 said: "* * * the 'discretionary function or duty' that cannot

form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable."

It would appear that the experimental activity involved here is precisely the type of function or duty which Congress did not intend to be actionable under the Tort Claims Act. Here we have a program authorized at the very highest level of Government, to be carried out for the public benefit with important decisions to be made all through the preparation until the final detonation. To say that the decisions made in carrying out the basic plan approved by the President are not discretionary would be clearly contrary to the intent of Congress and the principles enunciated in the Dalehite case.

There is an additional reason why there can be no recovery on count three which is founded on a theory of absolute liability without fault where the Government is engaged in an ultra-hazardous activity. In Dalehite v. United States, supra, the court stated that liability under the Tort Claims Act does not arise by virtue of the United States engaging in an extra-hazardous activity and that it is to be invoked only on a negligent or wrongful act or omission of an employee. See also United States v. Ure, 9 Cir., 225 F.2d 709; Rayonier, Inc., v. United States, 9 Cir., 225 F.2d 642.

In count four the plaintiff alleges that the United States intentionally took and acquired the right and privilege to shake and damage his property as an unavoidable result of its intentional detonating of atomic bombs; that this action was a taking for public use within the meaning of the Fifth Amendment to the Federal Constitution, and is there-

fore compensable. "Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time." United ed States v. Dickinson, 331 U.S. 745, 748, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789. It is the intent of the party who, it is claimed, has asserted a proprietary interest which is the determining factor. This intent may be manifested by a single deliberate act or it may be inferred by continuous or repeated acts, but a single isolated and unintentional act of the United States resulting in damage or destruction of property is not a taking in a constitutional sense. Harris v. United States, 10 Cir., 205 F.2d 765. It follows that even if we were to assume that the damage which occurred to plaintiff's property in October, 1951, resulted from the detonation of an atomic bomb, it was not a taking for public use for which compensation was payable under the Fifth Amendment.

Judgment will be for the defendant. Counsel for the defendant will prepare, serve and lodge findings and judgment in accordance with local rule 7.