[Civ. No. 19563. First Dist., Div. One. June 26, 1961.]

E. J. THIRION, Appellant, v. FREDRICKSON AND WATSON CONSTRUCTION COMPANY (a Corporation) et al., Respondents.

Chesley M. Walter, Robert M. Corson and M. F. Hallmark for Appellant.

Hagar, Crosby & Rosson, Carlisle C. Crosby and Burton Mason for Respondents.

TOBRINER, J.—For the reasons hereinafter stated, we cannot believe that a contractor who agrees to reconstruct a highway becomes liable for an injury caused by a preexisting depression on the highway within the area of the project but outside the area where he has worked. On the other hand a jury could infer negligence on the part of the contractor, and proximately caused injury, from the deposit of wet loose gravel on that part of the highway upon which the contractor had not yet undertaken construction. Hence the court properly granted a nonsuit as to the first matter but not as to the second.

Appellant suffered serious injuries on June 5, 1958, when his car went out of control and struck a tree as he drove north toward El Sobrante on the San Pablo Dam Road in Contra Costa County. Although appellant remembered seeing construction work on the road and signs which said " 'Road Construction, Drive Carefully,' " he recalled neither any barricades on the highway nor whether it was rough. He had no trouble driving on the road before the accident and admitted that he did not know "why the accident occurred or what caused it. . . ."

Three witnesses testified to the occurrence of the accident and the presence of loose, wet gravel in the area in which it took place. Two of these, eyewitnesses to the accident, Mrs. Lipp and Mrs. Gomez, testified that as they were proceeding

south toward Orinda they observed appellant's car, traveling at a maximum speed of 25 miles per hour, go off the road to its right, then cross over to their side, pass in front of their stopped car, hit the ditch and then a tree.

Mrs. Lipp indicated that appellant had his hands "on the wheel, and he was steering it," that after he got on their side of the road "he speeded up a little to get by," and when he hit the ditch "he bounced" and "his hands flew up" off the wheel. Mrs. Gomez also asserted that he had "both hands" on the wheel and that she supposed the car was turning in response to the movement of his hands. At no time did she see appellant "slump down or bend over his wheel, or in any position except upright behind the wheel." Immediately following the accident Mrs. Lipp observed a Shangri-La Cleaners truck skid on the pavement and come to a stop at the scene. It operated in the same area where she saw appellant's car. In that area, where she saw the truck "bounce around," "there was a gravel spot, and it was wet." She later saw skidmarks on the road in the same location as the gravel.

Corroborating Mrs. Lipp's testimony concerning the gravel, and recalling that she had first seen appellant's car move to the right off the road after clearing the new construction and entering upon the old pavement, Mrs. Gomez said that there was "gravel and water" where the old and new construction met and on the old section of the highway. She did not recall any skidmarks, but did see tire marks in the gravel.

The driver of the Shangri-La Cleaners truck also saw fairly fine loose gravel on the paved portion of the road over an area of from 15 or 20 yards from the point where it joined the new construction. He did not recall whether the gravel was wet or dry. The driver stated that he used that road twice a week during the period immediately preceding and following June 5, 1958, and that during that period the "car" would "fishtail a bit on the gravel" at "various points along the gravel section where the work was being effected," that is, "[o]n the portion of the highway that had been dug up," "[a]s distinct from the area . . . where a little dirt or rock had been tracked over onto the pavement." On the day of the accident, when he returned to the scene after finding a doctor for appellant, he fish-tailed "somewhat, but not dangerously."

Mrs. Bussa, a resident of the neighborhood, testified as to the presence of an alleged depression in the road. While Mrs. Bussa did not witness the accident, later that day she observed

tire marks from a 6-inch depression in the road leading to the tree which appellant hit. About a week prior to June 5, 1958, when she had struck the same depression she had lost control of her car and had been thrown to the left side of the road. The depression could not be seen from the car but extended over an area "[a]pproximately three by five feet." The record shows, however, that, although the contractor had been retained to build the highway in the area where the accident occurred, work had not yet commenced at the site of the depression, and there the old pavement remained.

Appellant, his brother, and a physician testified as to appellant's physical condition. Although appellant had had a slight stroke and an operation in 1957, both appellant and his brother denied knowledge of any difficulty of appellant with his heart. The physician, who treated him at the time of the accident, however, stated that appellant's medical history at the time of an operation in 1957 indicated that he had arteriosclerotic heart disease, and diffuse cerebral arteriosclerosis. While respondents' attorney implied that a blackout of appellant caused the accident, the doctor did not at any point admit that appellant's history showed such a tendency. The physician testified, however, that he could not state categorically that appellant could not have blacked-out on June 5, 1958.

At the conclusion of appellant's case the court granted respondents' motion for a nonsuit, which rested upon the dual grounds that: (1) "there is no evidence proving or tending to prove that . . . [respondents] were negligent," and (2) "there is no evidence proving or tending to prove that any act or omission of . . . [respondents] was a proximate cause of the accident in question and the alleged injuries and damages sustained by the . . . [appellant]." The court stated that "upon the pleadings and evidence there has not been produced evidence which is sufficient as a matter of law to show any negligence on the part of either defendant [respondents], or to show any causal connection between any act or omission on the part of either defendant [respondents] and the accident to the plaintiff's [appellant's] car as a result of which the plaintiff [appellant] sustained injuries."

Appellant urges error in the trial court's order on the grounds that the evidence submitted demonstrated respondents' negligence in allowing "wet loose gravel to accumulate on the paved portion of the old construction" and "a depres-

sion to exist in the roadway under their control''; that the testimony of appellant's witnesses presented ''a question of fact for the jury'' as to ''whether the negligence of the respondents was a proximate cause of appellant's injuries.'' On the other hand, respondents deny that appellant established any ''evidentiary basis'' showing that the ''presence of gravel and water on the old pavement constituted a 'dangerous condition' '' or that respondents ''had any knowledge of or responsibility for the alleged depression. . . .'' As to proximate cause, respondents claim that the testimony of appellant's ''eyewitness establishes that neither the presence of the gravel nor the claimed depression had any connection with the accident.''

We believe that the questions as to whether or not the presence of the wet gravel constituted a dangerous condition resulting from respondents' negligence, and whether or not such condition served as the proximate cause of appellant's injuries, framed issues for the jury. We have concluded, however, that the court properly ruled that, assuming the existence of the alleged depression, respondents could not properly be charged with negligence in regard to it.

Since, in analyzing all of these issues, we weigh the validity of a judgment of nonsuit, we give appellant the benefit of every legitimate inference adduced by the evidence. ''A judgment of nonsuit can be supported only if, disregarding conflicting evidence, and giving to plaintiff's evidence all the value to which it is legally entitled, indulging every legitimate inference which may be drawn from such evidence, the result is a determination that there is no evidence of sufficient substantiality to support a judgment for plaintiff.'' (*Aguirre* v. *City of Los Angeles* (1956), 46 Cal.2d 841, 844 [299 P.2d 862]; accord: *Bosqui* v. *City of San Bernardino* (1935), 2 Cal.2d 747, 760 [43 P.2d 547]; *Berger* v. *Lane* (1923), 190 Cal. 443, 452 [213 P. 45]; *Insolo* v. *Imperial Irr. Dist.* (1956), 147 Cal.App.2d 172, 174 [305 P.2d 176].)

If the evidence supported an inference of the contractor's negligence in creating a condition dangerous to the public, the jury could have properly found a verdict against respondents. '' 'A highway contractor doing work on a public highway or street owes to the traveling public the duty of protecting it from injury that may result from his negligence' '' (25 Cal.Jur.2d 99, quoted in *Breslin* v. *Fredrickson* (1957), 152 Cal.App.2d 780, 786 [313 P.2d 597]) and is under

"a duty to protect the public against dangerous conditions existing where the public in rightful use of the roadway might encounter such conditions" (*Breslin* v. *Fredrickson, supra,* 152 Cal.App.2d 780, 786).

Whether or not such a dangerous condition existed constitutes a question of fact. ■■ The cases hold that "[t]he question of whether or not a condition in a public street is actually dangerous and a menace to the safety of the traveling public is usually one of fact which is addressed to the triers of facts" (*Bigelow* v. *City of Ontario* (1940), 37 Cal.App.2d 198, 204 [99 P.2d 298]; *Alderson* v. *County of Santa Clara* (1954), 124 Cal.App.2d 334, 340 [268 P.2d 792, 52 A.L.R. 2d 1393]; *Breslin* v. *Fredrickson, supra,* 152 Cal.App.2d 780, 789), and "each case must depend upon its own facts" (*Fackrell* v. *City of San Diego* (1945), 26 Cal.2d 196, 206 [157 P.2d 625, 158 A.L.R. 773]). The court left to the triers of fact the question of the existence of a dangerous condition in the following instances: *Breslin* v. *Fredrickson, supra,* 152 Cal.App.2d 780 (drop-off of about 6 inches from pavement to shoulder of road); *Alderson* v. *County of Santa Clara, supra,* 124 Cal.App.2d 334 (rocks hidden in weeds off pavement); *Bigelow* v. *City of Ontario, supra,* 37 Cal.App.2d 198 (a drop from a hump in the road). On the other hand, the presence of a trivial defect in a sidewalk has on several occasions been held as a matter of law not to constitute a dangerous condition. (*Barrett* v. *City of Claremont* (1953), 41 Cal.2d 70 [256 P.2d 977]; *Whiting* v. *City of National City* (1937), 9 Cal.2d 163 [69 P.2d 990]; *Sischo* v. *City of Los Banos* (1940), 37 Cal. App.2d 717 [100 P.2d 305].)

We first analyze appellant's contention as to the gravel and then his argument as to the depression in the highway. ■■ Considerable evidence in the record would support a finding that respondents permitted the accumulation of "a lot of gravel" on the old, paved portion of the highway and that this quantity of gravel was further distant from the highway under construction than cars traveling on that portion would normally pick up and deposit on the old paved part.

Mrs. Gomez testified that "where the new construction was there was gravel and water"; that there was gravel "[o]n the old section of the highway"; that "there was a lot of gravel on the old portion of the highway"; that there was "water or . . . dampness on the old portion . . . down to the construction area."

Ward testified that there was "loose gravel" that extended "15 or 20 yards" "on the paved portion of the highway"; that the gravel "was of the crushed rock type, but it was fairly fine." He stated: "It did not look like it [the gravel] had been dumped on, but it extended for a greater distance than usually happens with cars picking it up with their tires." The area of the location of the loose, wet gravel marked the point at which appellant's car apparently went out of control. The jury could therefore have concluded that respondents created a condition, or permitted the continuation of a condition which they had initially caused, which endangered the public. The jury could have reasonably inferred that respondents' neglect resulted in a "lot of gravel" accumulating upon a portion of the old highway and that such a condition exposed the driving public to danger.

We do not believe the case of *Wahlen* v. *Castleman* (1954), 129 Cal.App.2d 296 [276 P.2d 836], cited by respondents, argues to the contrary. The court there passed upon a minor defect; "[a] *small amount* of gravel spread over a street might conceivably call for the use of some care on the part of a pedestrian, but would at most constitute a minor defect which would not give rise to liability. . . ." (Pp. 298-299; emphasis added.) In the instant case we deal with a situation of a lot of gravel perilous to motorists rather than a small amount of gravel not dangerous to pedestrians.

On parallel reasoning we conclude that sufficient evidence would have supported a finding of a causal connection between the excessive amount of gravel and the accident. It would not be an unreasonable hypothesis for the jury to conclude that the presence of the excessive gravel contributed to the loss of control of the car. ■ As stated in *Bady* v. *Detwiler* (1954), 127 Cal.App.2d 321 [273 P.2d 941]: "Want of proximate cause does not exist as a matter of law unless the only reasonable hypothesis is that such want exists; reasonable or sensible men could have drawn that conclusion and none other. Where there are differences that may be drawn, one for and one against, the one against will be followed." (P. 336.) ■ ■ Likewise, *Newman* v. *County of San Mateo* (1953), 121 Cal.App.2d 825 [264 P.2d 594], states: "While it is of course the law that the plaintiff must prove causation, and that a finding of causation cannot be predicated on mere speculation or conjecture [citations], it is also the law that

such finding may be predicated on an inference, if reasonable, and that the question is generally one of fact for the jury.'' (P. 829.)

█ We cannot accept respondents' contention that the evidence ''makes it clear that appellant was still in control of his car as he approached and passed the eyewitnesses, and did not lose control until the car arrived at the ditch on the west side of the road.'' Respondents seek to support this contention by references to the testimony of the eyewitnesses that appellant's ''hands were on the wheel, and he was steering it, because he missed us,'' that ''he was very close, . . . he speeded up a little to get by us, . . . he did make it,'' that ''he pulled to the left,'' that the car appeared to be turning in response to the movement of his hands, and that he was upright behind the wheel. We believe, however, that appellant's efforts to steer the car and to avoid the collision do not prove as a matter of law that he controlled the car. These acts were abortive attempts to handle the situation that had passed beyond appellant's control. Indeed, if appellant had been able to control the car he would not have initially swerved to the right, then crossed to the left, and hit the tree.

█ We conclude that the evidence would have supported a verdict based upon the presence of the dangerous condition, resulting from respondents' negligence, and upon the causal connection between that condition and the accident. The facts are sufficient to found the structure of such inferences.

█ We do not, however, find sufficient evidence to support a judgment against respondents on the ground of the claimed depression in the road, and, we believe that, in this respect, the court properly granted the nonsuit.

Although the depression lay within the area of the highway which respondents had contracted to reconstruct, they had not commenced work at that location. Admittedly respondents had not created the depression. To charge respondents, before they undertook to work in the locus of the depression, with liability for preexisting defects, would be to fasten upon them, immediately upon the assumption of the contract, an absolute liability for the condition of the entire highway within the project. It would be a physical impossibility for a contractor to correct every defect in the whole project as of the moment he commenced work. Neither these policy considerations nor

the cases induce a ruling that the contractor should be held liable under such circumstances.

While it does not pass precisely on this point, *Gibbons* v. *City of San Bernardino* (1951), 108 Cal.App.2d 33 [238 P.2d 115], suggests that the responsibility of the contractor attaches to the defect in the area which is both under its control and where it had worked. In that case the raised manhole which caused the accident "was in the portion of the street over which the city reserved control and authority." (P. 35.) The contractor, engaged in widening the street and removing curbs and gutters, "did not construct or maintain the dangerous condition which caused the accident." (P. 35.) The court held: "Undoubtedly, defendant was under a duty to use reasonable care to see that the portion of the street *under its control and upon which it had worked* was reasonably safe, but the defendant assumed no obligation for the raising of the manhole or other work performed by the city at points in the street where defendant was not performing construction work." (P. 35; emphasis added.)

Nor does appellant's position that the depression was "within the area under the control" of respondents find support in the cited case of *Breslin* v. *Fredrickson, supra,* 152 Cal.App.2d 780. In that case, after the contractor had completed the agreed resurfacing of the pavement of the highway, "there were places where the shoulder material lay as much as 6 inches below the finished surfacing. . . ." (P. 783.) The court declared: "The fact that the contractor here was not required to reshoulder the road does not mean that while he was controlling the roadway and under an obligation to take due care that the public could use the road with safety he was without duty as to the difference in elevation between the pavement and the shoulder material merely because his work did not extend beyond the edge of the pavement. The contractor's responsibility was not limited to dangerous conditions within the scope of his own work while he was in control of the job site. He was under a duty to protect the public against dangerous conditions existing where the public in rightful use of the roadway might encounter such conditions." (P. 786.) Hence, in *Breslin,* the contractor, having resurfaced the highway, left it "dangerous for use until further work had been done to render it safe." (P. 787.) Here respondents had not created any dangerous condition;

the depression preexisted their undertaking of any work on that portion of the highway.

We conclude, therefore, that the trial court properly held as a matter of law that the evidence would not sustain a finding that respondents had been negligent in not removing the claimed depression prior to the date of the accident. On the other hand, the deposit of wet, loose gravel at the scene of the accident for a greater distance from the highway under construction than that normally caused by ''cars picking it up with their tires'' presents a legitimate basis for a jury's finding that respondents negligently permitted the creation of such a condition of danger and that such negligence proximately caused the injury. The jury could have found the presence of the gravel incompatible with the absence of negligence.

We reverse the judgment and remand the cause for new trial in accordance with this opinion.

Bray, P. J., and Duniway, J., concurred.

A petition for a rehearing was denied July 21, 1961, and respondents' petition for a hearing by the Supreme Court was denied August 23, 1961. Schauer, J., was of the opinion that the petition should be granted.