[Civ. No. 8007. Fourth Dist., Div. Two. Jan. 17, 1967.]

RAYMOND PHIL SMITH et al., Plaintiffs and Appellants,
v. LOCKHEED PROPULSION COMPANY, Defendant
and Respondent.

Irmas & Rutter and William A. Rutter for Plaintiffs and Appellants.

Welsh & Cummins, Louis M. Welsh and W. F. Rylaarsdam for Defendant and Respondent.

TAMURA, J.—Plaintiffs appeal from a judgment of nonsuit in their action to recover damages to their real property allegedly caused by seismic vibrations activated by a static firing rocket motor test conducted by defendant on adjoining lands pursuant to a contract with the United States. The complaint was framed on theories of negligence and strict liability.

In accordance with the well settled rule governing review of a judgment of nonsuit, the evidence will be viewed in the light most favorable to plaintiffs. (*Kopfinger* v. *Grand Central Public Market,* 60 Cal.2d 852 [37 Cal.Rptr. 65, 389 P.2d 529]; *Meyer* v. *Blackman,* 59 Cal.2d 668 [31 Cal.Rptr. 36, 381 P.2d 916]; *Bristow* v. *Brinson,* 212 Cal.App.2d 168 [27 Cal. Rptr. 796]; *Bedford* v. *Bosko,* 217 Cal.App.2d 346 [31 Cal. Rptr. 727]).

Since 1957, plaintiffs had been the owners of approximately 160 acres of land in Potrero Valley near Beaumont in Riverside County. For the first few years following acquisition of the ranch, plaintiffs used it as an adult camp, but they thereafter had undertaken a program of improvements designed for its ultimate use as a boys' camp. One of the principal attributes of the property was a well which over the years had consistently produced high quality water.

In 1961, defendant acquired approximately 9,100 acres in Potrero Valley, one-half of it from its predecessor, Grand Central Rocket Company, for the purpose of testing rocket motors. A portion of the land bordered plaintiffs' property on three sides. In early 1962, defendant unsuccessfully sought to acquire plaintiffs' ranch, at which time defendant's counsel told plaintiff, "We have to have your land before we can test."

On April 25, 1962, the Beaumont News carried a press release issued by defendant announcing a scheduled test firing on May 12, 1962, and stating, "The firing is not expected to produce ground vibrations outside the Potrero Valley itself." Plaintiffs were apprehensive and communicated to defendant their concern for the safety of their well, structures, and horses. Defendant's counsel told plaintiffs not to worry and assured them that defendant would take care of any damage caused by the test. Being still concerned, plaintiffs, through their attorney, transmitted a letter to defendant again informing it of their anxiety and requested defendant to desist from proceeding with the test. Defendant's counsel responded to the communication by informing plaintiffs, "We can't stop the tests. It wouldn't be practical," and reassured them that defendant would take care of any damage.

On May 12, defendant proceeded with the scheduled test firing of a "120 inch solid fuel applied research rocket motor" of three segments, reputedly the largest solid fuel rocket motor to be test fired to that date. The item was manufactured by defendant for the United States Air Force and at the time of the test the United States was its legal owner. The motor was mounted nose-down on three "thrust collectors" which were affixed to a concrete base imbedded in the ground. The test stand was located approximately 7,800 feet from the boundary of plaintiffs' property. The firing lasted 132 seconds and created up to a maximum of 350,000 pounds of thrust.

Plaintiff, who was on the sundeck of one of his buildings at

the time of the test, felt a very strong vibration. A witness who was on plaintiffs' property testified that there was a rumbling, "similar to an earthquake taking place," which lasted five or six minutes. Another witness who was in Beaumont recalled that the earth tremor was similar to that which one would sense when a heavy truck passed by.

Immediately following the test, plaintiff inspected his property but found no damage to any structures. Water which was being pumped from the well into the swimming pool was clear throughout the period of the test but at test plus 80 minutes it became muddy. The changed water condition was called to the attention of defendant's counsel who appeared at the ranch a few hours following the test. Defendant's counsel stated, "I don't know how we could have done it, but I can't argue with 80 minutes."

Defendant thereafter supplied plaintiffs with bottled water and engaged a contractor to attempt to repair the well. The contractor, however, determined that the casing had been sheared at the 95-foot level and reported that the well was beyond repair. Defendant then engaged a well-digger who drilled a new well within a few yards of the old one but despite extensive tests it failed to produce any consistently potable water.

Plaintiffs' witness, Dr. Alford, an expert on seismology and structural vibrations, testified that in his opinion the test firing was the "probable cause" of the damage to the well. He found no reported seismic disturbances in Potrero Valley for a period of at least two months before and after the test. In his opinion, despite the low level vibrations at the ranch, the duration of the test increased the amplitude of the vibrations sufficient to cause the damage. He testified that the soil structure in Potrero Valley was porous and that the vibrations probably caused the underground water-filled soil to collapse at some point and that this additional weight on adjoining soil set off an "underground avalanche." In his opinion, an increase in the mass of the test stand would have decreased the vibrations.

A civil engineer specializing in waterworks testified that the interval of 80 minutes between the test and the time when the well water became muddy was consistent with the theory that the well damage was caused by a seismic disturbance. He explained the time-lag as "the same phenomena you see in a fresh road-cut, that the dirt continues to ravel after the disturbance occurs."

A real estate appraiser testified that the fair market value of the ranch on May 12, 1962, with the old well in production, was $206,000 but that absent the water supply, the fair market value would be $60,000.

In addition to the claimed devaluation of the property resulting from the loss of water supply, plaintiffs, in separate causes of action, sought damages for injuries to certain specific items of property caused by the contractors engaged by the defendant to restore the water supply. There was evidence that the contractors damaged a cement block wall, shrubbery, paving, and a skip loader.

At the close of plaintiffs' case, defendant moved for a nonsuit on the following grounds: (1) Plaintiffs' only remedy was an action in inverse condemnation against the United States; (2) Absence of evidence of negligence or other "breach of duty" by defendant; (3) The inapplicability of the doctrine of strict liability; and (4) Absence of evidence that plaintiffs' damages were the proximate result of defendant's act. The court granted the nonsuit primarily because, in its view, there was "insufficient evidence of negligence." It concluded that it was unnecessary to determine whether defendant's activity was ultrahazardous, apparently on the ground that the evidence failed to establish a causal relationship between the activity and the injury.[1]

Plaintiffs contend that on the evidence presented, the case should have been submitted to the jury on both theories—negligence and strict liability. If the evidence would support a jury verdict in plaintiffs' favor on either theory, the judgment must be reversed. ▮ This necessarily follows from the rule that a nonsuit may be granted " '. . . "only when, disregarding conflicting evidence and giving to plaintiffs' evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given". . . .' "

---

[1] In response to an inquiry by plaintiffs' counsel whether the court was determining that defendant's act was not ultrahazardous, the court stated, "No. I am not certain that I agree with that statement, because I find no proximate causal relationship between the alleged damages here and the activity involved here, even if it were to be characterized as ultrahazardous. So, I will not rule specifically with respect to that point. I find it unnecessary to determine whether or not this activity was ultrahazardous, because I find no evidence that whatever the character of that activity may have been that there was a causal relationship between that activity and the claimed damage."

(*Meyer* v. *Blackman, supra,* 59 Cal.2d 668, 671; *Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768]; *Kopfinger* v. *Grand Central Public Market, supra,* 60 Cal.2d 852, 855; *Reuther* v. *Viall,* 62 Cal.2d 470, 474 [42 Cal.Rptr. 456, 398 P.2d 792]; *Hansen* v. *Richey,* 237 Cal.App.2d 475, 477 [46 Cal.Rptr. 909]; *McDonald* v. *City of Oakland,* 233 Cal.App.2d 672, 674 [43 Cal.Rptr. 799]).

Before we reach the question whether the case should have been submitted to the jury on either theory of liability, we must determine whether there was sufficient evidence from which the jury could have properly found that the test firing was the cause in fact of the damage to the well. It is axiomatic that an essential element of a plaintiff's cause of action, whether based on negligence or strict liability, is the existence of a causal connection between defendant's act and the injury which plaintiff suffered. (Prosser, Law of Torts, (2d ed. 1955) p. 218 et seq.).

Cause in fact, as well as proximate cause, is ordinarily a fact question for the jury. (*Basin Oil Co.* v. *Baash-Ross Tool Co.,* 125 Cal.App.2d 578, 603-604 [271 P.2d 122]; *Ishmael* v. *Millington,* 241 Cal.App.2d 520, 525 [50 Cal.Rptr. 592]; *Burdette* v. *Rollefson Constr. Co.,* 52 Cal.2d 720, 726 [344 P.2d 307]; Rest.2d Torts, § 434.) It cannot be said that the evidence shows a want of causation as a matter of law unless the only reasonable hypothesis is that such want exists; if reasonable minds may differ, it is a jury question. (*Thirion* v. *Fredrickson & Watson Constr. Co.,* 193 Cal.App. 2d 299, 306 [14 Cal.Rptr. 269]).

Viewed in the light of those well-established rules, the evidence heretofore summarized was sufficient to entitle plaintiffs to have the issue of causation submitted to the jury. The subject of causation in the circumstances here presented was a proper one for expert opinion. (*Bowen* v. *Sierra Lumber Co.,* 3 Cal.App. 312, 320-321 [84 P. 1010]; *Ryan* v. *Oakland Gas Light etc. Co.,* 10 Cal.App. 484, 493 [102 P. 558]; See *Clark* v. *Willett,* 35 Cal. 534, 544; *Vandermark* v. *Ford Motor Co.,* 61 Cal.2d 256, 260 [37 Cal.Rptr. 896, 391 P.2d 168]). In addition, there was circumstantial evidence of sufficient substantiality from which the jury could have reasonably drawn the inference that the test firing was the *sine qua non* of the damage to the well. Although a finding of causation may not be based on mere speculation or conjecture, such finding may be predicated on reasonable inferences drawn from circumstantial evidence. (*Thirion* v.

*Fredrickson & Watson Constr. Co., supra,* 193 Cal.App.2d 299, 306; *Newman* v. *County of San Mateo,* 121 Cal.App.2d 825, 829 [264 P.2d 594]; See *Roddiscraft, Inc.* v. *Skelton Logging Co.,* 212 Cal.App.2d 784, 800-801 [28 Cal.Rptr. 277]; *Johnson* v. *Griffith,* 19 Cal.2d 176, 179 [120 P.2d 6]). In the proof of structural damage from concussion or earth vibration caused by blasting operations, circumstantial evidence has been held sufficient to support a finding of causation. (*McGrath* v. *Basich Bros. Constr. Co.,* 7 Cal.App.2d 573, 575 [46 P.2d 981]; *Ellison* v. *Walker* (1955, Okla.) 281 P.2d 931; *Whitney* v. *Ralph Myers Contracting Corp.* (1961) 146 W.Va. 130 [118 S.E.2d 622, 624-625]; *Scranton* v. *L. G. De Felice & Son* (1951) 137 Conn. 580 [79 A.2d 600, 601]). In *McGrath* v. *Basich Bros. Constr. Co., supra,* plaintiffs' witnesses testified that immediately following the blast, they noted that the house had moved on its foundation and windows had pulled away from their casings. Defendant's experts testified that considering soil conditions and the amount of charge used, it would have been scientifically impossible for the explosives to have caused the claimed damage. In holding that the evidence was sufficient to support a jury finding of causation, the court stated at page 575: "The relative weight between conflicting scientific testimony and circumstantial evidence as to facts is to be determined by the jury or the trial court."

Defendant contends that the testimony of Dr. Alford was discredited on cross-examination when he admittedly had difficulty in explaining the time-lag between the test and when the water from the well ran muddy. In reviewing a judgment of nonsuit, however, it is not the function of the reviewing court to pass on the credibility of a witness or determine whether he has been impeached by his own contradictory statements or by the testimony of other witnesses. (See *Michael Distributing Co.* v. *Tobin,* 225 Cal.App.2d 655, 661 [37 Cal. Rptr. 518]). Conflicting evidence on behalf of defendant, whether elicited on cross-examination of plaintiffs' witnesses or elicited by plaintiffs from adverse witnesses under section 2055 of the Code of Civil Procedure, must be disregarded. (*Anthony* v. *Hobbie,* 25 Cal.2d 814 [155 P.2d 826]; *Marchetti* v. *Southern Pac. Co.,* 204 Cal. 679, 686 [269 P. 529]).

Turning to the issue of negligence, we are in accord with the trial court's conclusion that there was no evidence from which the jury could have validly found that defendant failed to exercise due care in the selection of the test site, construction of the test stand, or in the manner in which the test was

conducted. Although it might be inferred from Dr. Alford's testimony that a test stand of a greater mass, or one which was further removed, would have reduced vibrations at plaintiffs' ranch, there was no evidence to show that reasonably prudent engineering practices for the activity would have required additional precautions or the nature or extent thereof. Since rocket testing is not within the common experience of ordinary persons, the jury could not have been expected to apply a standard of reasonable care drawn from experience. (Prosser, Law of Torts, (2d ed. 1955) p. 135). In short, there was no evidence from which the jury could have determined that the manner in which the test was conducted was not consistent with reasonably prudent engineering practices for the activity in question (cf. *Inouye* v. *Black,* 238 Cal.App.2d 31 [47 Cal.Rptr. 313]).

Plaintiffs are, in effect, contending that the jury should have been permitted to draw an inference of negligence from the fact that the test firing caused damage to plaintiffs' adjoining property; in other words, to apply the doctrine of res ipsa loquitur. In our opinion, res ipsa is inapplicable to the factual setting of this case. "The doctrine of res ipsa loquitur is applicable where the accident is of such a nature that it can be said, in the light of past experiences, that it probably was the result of negligence by someone and that the defendant is probably the one responsible." (*Di Mare* v. *Cresci,* 58 Cal.2d 292, 298 [23 Cal.Rptr. 772, 373 P.2d 860], and cases there cited; *Seeley* v. *Combs,* 65 Cal.2d 127, 130 [52 Cal.Rptr. 578, 46 P.2d 810]). In the instant case, it cannot be said that from past experience the damage to plaintiff's well was probably the result of defendant's negligence, either in the manner in which the test was conducted or in the location or construction of the test stand. See *Bartholomae Corp.* v. *United States* (1955) 135 F. Supp. 651, affd. 253 F.2d 716 (Res ipsa loquitur held inapplicable where plaintiff sought to recover for structural damages caused by a nuclear detonation.).

Defendant's attempt to repair the well and the payment of the cost of drilling the new well did not constitute admissions of negligence. ■ An offer to pay, or actual payment, in aid of one who has been injured is not an admission of liability. (*Oldenburg* v. *Sears Roebuck & Co.,* 152 Cal.App.2d 733, 748-749 [314 P.2d 33]). ■ Nor was the statement of defendant's counsel, "I can't argue with 80 minutes" an admission of liability; at most it was an admission of a casual connection between the test and damage to the well.

Plaintiffs complain that the court erroneously precluded their expert from testifying to facts from which the jury might have found negligence. Plaintiffs offered to prove through Dr. Alford that prudent engineering practices would have required the test stand to be placed equidistant from the boundaries of defendant's property. Objection to the offer was sustained, the court stating that "this was a matter the jury could determine and not a matter of expert testimony."[2] Plaintiffs, with some justification, question how the court, after rejecting the offered testimony on the ground that the jury could draw its own conclusion as to whether defendant was negligent in placing the test stand where it did, could, consistent with that ruling, grant a nonsuit for lack of evidence of negligence.

The fact that an expert's opinion is on an ultimate issue to be determined by a jury is not a ground for its exclusion. *People* v. *Cole,* 47 Cal.2d 99, 103 [301 P.2d 854, 56 A.L.R.2d 1435] ; *Magee* v. *Wyeth Laboratories, Inc.,* 214 Cal. App.2d 340, 357 [29 Cal.Rptr. 322] ; *Carey* v. *Lima, Salmon & Tully Mortuary,* 168 Cal.App.2d 42, 45-46 [335 P.2d 181]).

The crucial consideration in determining whether expert testimony should be received is whether ". . . the subject of the inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (*People* v. *Cole, supra,* 47 Cal.2d 99, 103; Witkin, California Evidence, (2d ed. 1966) § 409 p. 367). Expert testimony is admissible for the purpose of showing recognized accepted standards of practice in the professions. (Witkin, California Evidence, (2d ed. 1966) § 420 p. 380).

Although we have determined that the evidence on the present state of the record was insufficient to entitle plaintiffs. to have their case submitted to the jury on the negligence theory, since, for reasons hereafter stated, the judgment must otherwise be reversed, plaintiffs should be accorded a new trial as well on the negligence issue in view of the court's ruling excluding the offered testimony of Dr. Alford.

On the issue of strict liability, plaintiffs urge that defendant was engaged in an ultrahazardous activity and hence, was liable without regard to fault.

---

[2] Defendant asserts that the objection was sustained for lack of a foundation. The record, however, does not support this contention.

California makes no distinction between trespass by forcible injury and trespass committed by consequential and indirect injury. (*Coley* v. *Hecker*, 206 Cal. 22, 28 [272 P. 1045]; *Gallin* v. *Poulou*, 140 Cal.App.2d 638, 641 [295 P.2d 958]).

Actionable trespass may be committed indirectly through concussions or vibrations activated by defendant's conduct. (*McNeill* v. *Redington*, 67 Cal.App.2d 315, 320 [154 P.2d 428]; *McGrath* v. *Basich Bros. Constr. Co., supra,* 7 Cal.App.2d 573, 576; *Colton* v. *Onderdonk*, 69 Cal. 155, 159 [10 P. 395, 58 Am.Rep. 556]; See *Gallin* v. *Poulou, supra,* at page 641). As the court observed in *McGrath* v. *Basich Bros. Constr. Co., supra,* at page 576: "It is immaterial whether the injuries were caused by the shaking of the earth or pulsation of the air or by physical projectiles or missiles."

The law in this state respecting liability for trespass is in accord with the view expressed in the Restatement of Torts: "[T]here is no liability for a trespass unless the trespass is intentional, the result of recklessness or negligence, or the result of injuries in an extra-hazardous activity." (*Gallin* v. *Poulou, supra,* 140 Cal.App.2d 638, 645; Rest.2d Torts, §§ 158, 165, 166; Prosser, Law of Torts, (2d ed. 1955) p. 55; *Dufour* v. *H. J. Kaiser Co.*, 215 Cal.App.2d 26, 30 [29 Cal. Rptr. 871]).

As heretofore indicated, the evidence in the instant case was insufficient to show negligence. Nor can defendant's conduct be deemed an intentional trespass or one resulting from recklessness. The crucial issue, therefore, is whether defendant's activity may be classified as ultrahazardous.

In *Green* v. *General Petroleum Corp.*, 205 Cal. 328 [270 P. 952, 60 A.L.R. 475], where an oil well "blew out" through no fault of the defendant and cast debris on plaintiffs' property, the court, relying on section 3514 of the Civil Code,[3] held that the defendant was nevertheless liable. The case has been generally interpreted as one involving strict liability for damages resulting from an ultrahazardous activity. (*Luthringer* v. *Moore*, 31 Cal.2d 489, 500 [190 P.2d 1]; *Gallin* v. *Poulou, supra,* 140 Cal.App.2d 638, 644; *Boyd* v. *White*, 128 Cal.App.2d 641, 654 [276 P.2d 92]). *Luthringer* v. *Moore, supra,* held that one using hydro-cyanic gas in fumigating a building was absolutely liable to a person in an adjoining building who was injured by the escaping gas. The court applied the principle of *Green* v. *General Petroleum Corp.,*

[3] "One must so use his own rights as not to infringe upon the rights of another." (Civil Code, § 3514)

*supra,* stating at page 500 : "It is not significant that a property damage, as distinguished from a personal injury, was there [*Green* v. *General Petroleum Corp.*] involved. The important factor is that certain activities under certain conditions may be so hazardous to the public generally, and of such relative infrequent occurrence, that it may well call for strict liability as the best public policy."

Section 520 of the Restatement of Torts defines ultrahazardous activity as follows: "An activity is ultrahazardous if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage." California has apparently accepted the Restatement definition. (*Luthringer* v. *Moore, supra,* 31 Cal.2d 489, 498, 499; *Gallin* v. *Poulou, supra,* 140 Cal.App.2d 638, 645; *Beck* v. *Bel Air Properties, Inc.,* 134 Cal.App.2d 834, 841-842 [286 P.2d 503]).

Whether an ativity is ultrahazardous is a question of law to be determined by the court. (*Luthringer* v. *Moore, supra,* at page 496; *Beck* v. *Bel Air Properties, Inc., supra,* at page 842; Rest., Torts, § 520, com. h).

In our opinion, defendant's activity must be classed as ultrahazardous. The solid fuel rocket motor was the largest ever tested to that date. Test firing such a device is not a matter of common occurrence. The fact that defendant found it necessary to acquire 9,100 acres for its purposes, and at one time told plaintiffs it needed their property in order to conduct the test, is evidence of its recognition of the risk inherent in the undertaking despite the exercise of due care. In these circumstances, public policy calls for strict liability. (*Luthringer* v. *Moore, supra,* 31 Cal.2d 489, 500; Rest., Torts, § 520). There is no basis, either in reason or justice, for requiring the innocent neighboring landowner to bear the loss. Defendant, who is engaged in the enterprise for profit, is in a position best able to administer the loss so that it will ultimately be borne by the public. As Professor Prosser summarizes the rationale for the imposition of strict liability: "The problem is dealt with as one of allocating a more or less inevitable loss to be charged against a complex and dangerous civilization, and liability is placed upon the party best able to shoulder it." (Prosser, Law of Torts, (2d ed. 1955) page 318).

The precise issue before us—whether rocket motor testing constitutes an ultrahazardous activity — was squarely con-

sidered and answered affirmatively in *Berg* v. *Reaction Motors Div.* (1962) 37 N.J. 396 [181 A.2d 487], under a factual setting remarkably similar to the instant case. Defendant had contracted with the United States for the development and production of a rocket engine for the X-15 supersonic airplane. Motors designed for a maximum thrust of 50,000 pounds were tested on two test stands, one located 6,800 feet and the other 3,500 feet from the village of Lake Telemark. In an action by the residents of the village for structural damages to their homes caused by air concussion and vibrations, the trial court dismissed a cause of action based on negligence but submitted the case to the jury on the theory of trespass and nuisance. In affirming a judgment for plaintiffs,[4] the court stated: "A business enterprise which engages in blasting operations knows that despite the precaution it takes, neighboring properties may be damaged. If damage does occur, it should in all fairness be absorbed as an operating business expense, for the enterprise may not reasonably expect its wholly innocent neighbor to shoulder the loss. It seems to us that the foregoing considerations apply with even greater force to the case at hand. The extraordinary activities of the defendant may readily be classed as ultrahazardous and, unlike the situation in many of the blasting cases, the significant structural damage resulted from their continuation after receipt of repeated complaints from the neighboring landowners." (*Berg* v. *Reaction Motors Div.*, *supra*, 181 A.2d at page 494).

Defendant contends that it should not be subjected to strict liability because the testing was conducted in an area remote from civilized influences. It is true that classification of an activity as ultrahazardous does not automatically subject one engaged in it to strict liability without regard to place or circumstances. Thus, while blasting in a developed area calls for strict liability, (*Colton* v. *Onderdonk*, *supra*, 69 Cal. 155; *McKenna* v. *Pacific Elec. Ry. Co.*, 104 Cal.App. 538; *Alonso* v. *Hills*, 95 Cal.App.2d 778 [214 P.2d 50]) blasting in an isolated area may not. (*Houghton* v. *Loma Prieta Lumber Co.*, 152 Cal. 500 [93 P. 82, 14 Ann.Cas. 1159, 14 L.R.A. N.S. 913]). In *Houghton* v. *Loma Prieta Lumber Co.*, *supra*, on which defendant relies, an independent contractor was engaged in constructing a wagon road over rugged mountainous

---

[4] The jury returned a verdict for both compensatory and exemplary damages. On appeal, the court affirmed the judgment as to compensatory damages but reversed as to exemplary damages on the ground that there was insufficient evidence to support a punitive award.

terrain which was theretofore inaccessible. Decedent, for whose death the action was brought, happened to be in the vicinity where the contractor was using dynamite to remove a tree trunk and was struck by a flying rock. The risk was thus not one which the defendant contractor, under the circumstances, should have anticipated. In the instant case, although the test site was in a generally undeveloped area, portions of defendant's property bordered plaintiffs' ranch on three sides and defendant was fully cognizant of the risk of harm to plaintiffs' lands and improvements. The circumstances are thus clearly distinguishable from those present in *Houghton, supra.*

Finally, we reach the contention that since the test was being performed pursuant to a government contract, defendant, in the absence of negligence, is entitled to share the immunity of the government. We shall assume for the purpose of this case that the United States could not be sued under the Federal Tort Claims Act (28 U.S.C.A. §§ 1346, 2671-2680) since the act has been held not to extend to cases where liability without fault is the only basis for the asserted liability. (*Dalehite* v. *United States* (1953) 346 U.S. 15, 30 [97 L.Ed 1427, 1437, 73 S.Ct. 956, 972]; *Bartholomae Corp.* v. *United States, supra* (1955) 135 F.Supp. 651, 654, affd. 253 F.2d 716; *Barroll* v. *United States* (1955) 135 F.Supp. 441, 446-447; *United States* v. *Ure* (1955) 225 F.2d 709; *United States* v. *Praylou* (1953) 208 F.2d 291). The question here is whether an independent contractor engaged in an ultrahazardous activity enjoys the protective shield of immunity because it is performing a government contract.[5]

Defendant relies upon the general rule that in the absence of negligence or unauthorized departure from plans and specifications, a contractor engaged in the construction of a public improvement under a contract with a public body is not liable for consequential injury to adjacent property that may result as a necessary incident from the prosecution of the work in accordance with the terms of the contract and the plans and specifications, citing *Yearsley* v. *W. A. Ross Constr. Co.* (1940) 309 U.S. 18 [84 L.Ed. 554, 60 S.Ct. 413]; *Myers* v. *United States* (1963) 323 F.2d 580; *Valley Forge Gardens,*

---

[5] The question whether the contractor shares the immunity of the United States probably presents a federal question. (cf. *Howard* v. *Lyons* (1959) 360 U.S. 593 [3 L.Ed.2d 1454, 79 S.Ct. 1331]; *Garner* v. *Rathburn* (1965) 346 F.2d 55). Our research has failed to reveal any federal cases on this issue and none has been called to our attention by the parties.

*Inc.* v. *James D. Morrissey, Inc.* (1956) 385 Pa. 477 [123 A.2d 888]; *Garrett* v. *Jones* (1948, Okla.) 200 P.2d 402. In California, as elsewhere, the rationale for the rule has been stated either in terms of shared immunity or nontortious conduct. (*Gruner* v. *Barber,* 207 Cal.App.2d 54, 59-60 [24 Cal. Rptr. 292]; *Marin Mun. Water Dist.* v. *Peninsula Paving Co.,* 34 Cal.App.2d 647, 652-653 [94 P.2d 404]; *De Baker* v. *Southern Cal. Ry. Co.,* 106 Cal. 257, 284-285 [39 P. 610, 46 Am.St.Rep. 237]; *Heimann* v. *City of Los Angeles,* 30 Cal.2d 746, 757 [185 P.2d 597].)

The cases above-mentioned which were cited by defendant are not controlling in the instant case. They, and others like them which have invoked the general rule, did not involve ultrahazardous activity. Moreover, although some of the cases speak in terms of immunity, thus presupposing an otherwise valid cause of action, the contractor in those cases would not have been liable under accepted legal principles relating to liability for trespass without regard to the question of immunity. (*Gallin* v. *Poulou, supra,* 140 Cal.App.2d 638, 645; Rest.2d Torts, §§ 158, 165, 166; Prosser, Law of Torts, (2d ed. 1955) p. 55).

The only case cited by defendant applying the general rule to a contractor engaged in an ultrahazardous activity is *Pumphrey* v. *J. A. Jones Constr. Co.* (1959) 250 Iowa 559 [94 N.W.2d 737]. There plaintiff sought to recover for damages to his dwelling caused by concussions and vibrations resulting from defendant's use of explosives in constructing a new lock in the Mississippi River. The parties stipulated that defendant was not negligent, that the work was performed in accordance with the terms of the contract, and that the method used in blasting had been submitted to the government, approved by it, and was a part of the specifications. The court refused to recognize any distinction between ultrahazardous and nonultrahazardous activity and, while noting that some cases find nonliability on the theory of immunity and others because the contractor is doing only what is required by the contract, concluded at 94 N.W.2d, page 743: "The underlying principle in each [theory] is that the state may make improvements for the public good, as in improving navigation, and is not responsible for consequential or incidental damage to private property not amounting to a taking without compensation, in so doing; and that it may do this work through contracts with others, who have the same immunity or non-

liability from suit as the government itself if they carry out their agreement as specified."

Other cases, however, have refused to extend immunity to a contractor engaged in the performance of a contract for the construction of a public improvement where damage to adjoining property resulted from the use of explosives. In *Asheville* v. *Southern Ry. Co.* (1927) 19 F.2d 32, in refusing to extend immunity, the court stated that ". . . irrespective of the liability of the district, we think that there can be no doubt that the contractor and the subcontractor are liable for the damage caused." Similarly, in *Scranton* v. *L. G. De Felice, supra* (1951) 137 Conn. 580 [79 A.2d 600], followed in *Whitney* v. *Ralph Myers Contracting Corp., supra* (1961) 146 W.Va. 130 [118 S.E.2d 622], the court refused to extend immunity to a contractor using explosives in the construction of a state highway. In *Whitney, supra,* the court concluded that *Benner* v. *Atlantic Dredging Co.,* 134 N.Y. 156, 161 [31 N.E. 328, 17 L.R.A. 220] and *Nelson* v. *McKenzie-Hague Co.,* 192 Minn. 180, 183 [256 N.W. 96, 97 A.L.R. 196] upon which *Pumphrey* v. *J. A. Jones Constr. Co., supra,* relied were not controlling, stating at page 629: ". . . it is true that in some jurisdictions it is held that one who acts as the agent of government by virtue of a contract or otherwise is not liable for damages which result indirectly from what the government has commanded him to do. *Benner* v. *Atlantic Dredging Co.,* 134 N.Y. 156, 161 [31 N.E. 328, 17 L.R.A. 220]; *Nelson* v *McKenzie-Hague Co.,* 192 Minn. 180, 183 [256 N.W. 96, 97 A.L.R. 196]. Although there may be some confusion arising out of dicta, for the most part such cases do not go so far as to grant immunity from liability for damage which is so direct as to constitute something like trespass." In *Smith* v. *Aldridge* (1962 Mo.App.) 356 S.W.2d 532, the court refused to follow *Pumphrey* v. *J. A. Jones Constr. Co., supra,* on the ground that no showing had been made that the manner in which the contractor used the explosives was governed by the contract.

In *Berg* v. *Reaction Motors Div., supra* (1962) 37 N.J. 396 [181 A.2d 487], the court, although ultimately concluding that the immunity issue was not properly before it, nevertheless carefully considered the question and expressed its disapproval of extending immunity to the contractor. ". . . Extension of the Government's immunity to independent contractors would run counter to recent trends and expressions which emphasize the need for restricting the immunity and

the rightness of affording relief to those who suffer special damage without regard to whether the activity which caused the damage was governmental or private. See *McCabe* v. *New Jersey Turnpike Authority* (1961) 35 N.J. 26, 33 [170 A.2d 810]; *Taylor* v. *New Jersey Highway Authority* (1956) 22 N.J. 454, 470 [126 A.2d 313, 62 A.L.R.2d 1211]; cf. *Schwartz* v. *Stockton* (1960) 32 N.J. 141, 147 [160 A.2d 1]; *Cloves* v. *Delaware Tp.* (1957) 23 N.J. 324, 327 [129 A.2d 1, 57 A.L.R. 2d 1327]. See also *Griggs* v. *Allegheny County* (1962) 369 U.S. 84 [7 L.Ed.2d 585, 82 S.Ct. 531]; *United States* v. *Causby* (1946) 328 U.S. 256 [90 L.Ed. 1206, 66 S.Ct. 1062]; cf. *Malone* v. *Bowdoin* (1962) 369 U.S. 643 [8 L.Ed.2d 168, 82 S.Ct. 980] (Douglas, J., dissenting)." (181 A.2d at pp. 497-498).

The court distinguished *Pumphrey* v. *J. A. Jones Constr. Co., supra,* on the ground that the parties had there stipulated that the blasting was performed under the supervision of government inspectors and in strict accordance with the specifications whereas in *Berg* there was no evidence ". . . to indicate that the Government had prescribed the site of the tests, or the location of the test stands, or the manner of conducting the tests." (*Berg* v. *Reaction Motors Div., supra,* 181 A.2d at p. 498).

It is our conclusion that immunity should not be extended to the contractor in the instant case. *Pumphrey* may be distinguished, as it was in *Berg,* because in the present state of the record there is no evidence that the Government selected the test site, prescribed the specifications for the construction of the test stand or its location, or specified the manner of conducting the test. This is a valid ground of distinction. (See *McGrath* v. *Basich Bros. Constr. Co., supra,* 7 Cal.App.2d 573, 578; *Smith* v. *Aldridge, supra* (1962, Mo. App.) 356 S.W.2d 532). But even assuming that the defendant would be able to show that its activities were all in strict accordance with the contract and plans and specifications, it is our opinion that defendant may not escape liability on the ground of shared governmental immunity.

We believe that a valid distinction exists in this regard as between one engaged in an ultrahazardous activity and one performing activities not so classed. (See *Rector* v. *Tobin Constr. Co.* (1964, Mo.) 377 S.W.2d 409). Where nonultrahazardous activity is involved, the ordinary rules governing liability for indirect trespass fairly define the rights and duties of the affected parties without regard to immunity. Where

ultrahazardous activity which would otherwise subject the contractor to strict liability is involved, the contractor may be relieved only by extending to it the cloak of immunity. As between an innocent adjoining landowner and the contractor, we find no compelling reason for so extending immunity. The doctrine of sovereign immunity for torts has been termed "an anachronism without rational basis." (*Muskopf* v. *Corning Hospital Dist.*, 55 Cal.2d 211, 216 [11 Cal.Rptr. 89, 359 P.2d 457]). Its extension would be clearly contrary to the trend of recent decisions in this state and elsewhere. (*Muskopf* v. *Corning Hospital Dist, supra*). The fact that under its contract the defendant may pass on to the government the cost of insuring against such risks is not a ground for extending immunity to the contractor. (cf. *Alabama* v. *King & Boozer* (1941) 314 U.S. 1 [86 L.Ed. 3, 62 S.Ct. 43, 140 A.L.R. 615] ; *James Stewart & Co.* v. *Sadrakula* (1940) 309 U.S. 94 [84 L.Ed. 596, 60 S.Ct. 431, 127 A.L.R. 821] ; *United States* v. *City of Detroit*, 355 U.S. 466, 495, 505 [2 L.Ed.2d 424, 78 S.Ct. 474, 486]).

In *Pumphrey* v. *J. A. Jones Constr. Co., supra* (1959) 250 Iowa 559 [94 N.W.2d 737], the court questioned whether a sound distinction could be drawn between a contract calling for the use of a dangerous instrumentality and a nonultrahazardous activity by saying : " [D]redging may cause changes in the current of rivers, or the building of dams may cause overflows, also damaging to adjacent property owners or possibly others. In that sense, any of these works may be 'dangerous instrumentalities'. We see no reason for applying a different rule in explosives cases than in others which in themselves may cause harm without negligence, so far as the extension of the principle of governmental immunity to one who contracts to do what the government requires and does it as agreed and with due care is concerned." The quoted statements fail to consider the fact that even with respect to work not classified as ultrahazardous, the contractor would be liable if he knew, or should have known, that the plans and specifications were inherently dangerous. See (*Hamilton* v. *Harkins*, 146 Cal. App.2d 566, 572-573 [304 P.2d 82] ; *De Baker* v. *Southern Cal. Ry. Co., supra*, 106 Cal. 257, 281 [39 P. 610, 46 Am.St.Rep. 237]). The same considerations justify imposition of strict liability where one contracts to perform an activity which involves inherent risks to adjacent properties because it is ultrahazardous.

In *Pumphrey, supra* (1959) 250 Iowa 559 [94 N.W.2d 737], the court also, without deciding the issue, suggested that if the

injury complained of amounted to a "taking," the plaintiffs would not be remediless. It is doubtful, however, that the injury in that case would be deemed an appropriation or "taking" within the meaning of the Fifth Amendment so as to give the injured plaintiffs a cause of action in inverse condemnation. (See *United States* v. *Causby* (1946) 328 U.S. 256 [90 L.Ed. 1206, 66 S.Ct. 1062] ; *Bartholomae Corp.* v. *United States, supra* (1955) 135 F.Supp. 651, 654, affd. 253 F.2d 716; *Richards* v. *Washington Terminal Co.* (1914) 233 U.S. 546 [58 L. Ed. 1008, 34 S.Ct. 654, 3 L.R.A. 1915A 887] ). The prospects of a successful inverse condemnation action against the United States is even more remote in the instant case. It does not involve a contract for the construction of a public improvement such as a highway, levee, or a dam. Defendant, simply as a part of its contractural obligation to develop and produce an article for the government, was conducting tests on its property and with its facilities. In an inverse condemnation action against the United States, plaintiffs would not only be confronted with the difficult question whether the injury constituted a "taking," it would be faced with the formidable task of showing that the "taking" was for a public purpose.

For the foregoing reasons we conclude that the judgment must be reversed with respect to plaintiffs' causes of action (on the theory of negligence and strict liability) for the devaluation of their ranch resulting from the injury to or destruction of their water well.

With respect to the causes of action for damages caused by the contractors engaged by defendant to restore the water supply—damage to the cement block wall, shrubbery, paving, and a skip loader—the judgment of nonsuit must be affirmed. There is no evidence that the contractors were trespassers or that they were other than independent contractors. Thus a verdict against the defendant for damages to the items mentioned could not be upheld. (*McDonald* v. *Shell Oil Co.*, 44 Cal.2d 785, 788 [285 P.2d 902] ; *Green* v. *Soule,* 145 Cal. 96, 100 [78 P. 337] ).

For the foregoing reasons the judgment of nonsuit is affirmed as to the 5th, 6th and 7th causes of action but reversed as to the remaining causes of action.

McCabe, P. J., and Kerrigan, J., concurred.

A petition for a rehearing was denied February 9, 1967, and respondent's petition for a hearing by the Supreme Court was denied March 15, 1967.